# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHRISTOPHER SHELDON ARNOLD**                    **CIVIL ACTION**

**VERSUS**                                                            **NO. 19-690**

**CAPTAIN DANNY HONEYCUTT**                    **SECTION: "A"(1)**

## REPORT AND RECOMMENDATION

Petitioner, Christopher Sheldon Arnold, a Louisiana state prisoner, filed the instant federal application pursuant to 28 U.S.C. § 2254. For the following reasons, the application should be **DISMISSED WITH PREJUDICE**.

On March 12, 2004, petitioner was convicted of armed robbery under Louisiana law,[1] and he was then sentenced to a term of forty years' imprisonment without benefit of parole, probation, or suspension of sentence on January 18, 2005.[2] The Louisiana First Circuit Court of Appeal affirmed his conviction on September 19, 2007,[3] and thereafter separately affirmed his sentence on October 14, 2008.[4] The Louisiana Supreme Court denied his related direct-review writ applications on March 7, 2008,[5] and September 18, 2009.[6]

On June 15, 2010, petitioner filed an application for post-conviction relief with the state district court.[7] That application was denied on December 21, 2011,[8] and September 21, 2016.[9]

---

[1] State Rec., Vol. 2 of 5, transcript of March 12, 2004, p. 118; State Rec., Vol. 2 of 5, minute entry dated March 12, 2004; State Rec., Vol. 1 of 5, jury verdict form.

[2] State Rec., Vol. 2 of 5, transcript of January 18, 2005; State Rec., Vol. 2 of 5, minute entry dated January 18, 2005.

[3] State v. Arnold, 970 So. 2d 1067 (La. App. 1st Cir. 2007); State Rec., Vol. 2 of 5.

[4] State v. Arnold, No. 2008 KA 0306, 2008 WL 4567331 (La. App. 1st Cir. Oct. 14, 2008); State Rec., Vol. 2 of 5.

[5] State ex rel. Arnold v. State, 977 So. 2d 904 (La. 2008); State Rec., Vol. 2 of 5.

[6] State v. Arnold, 17 So. 3d 385 (La. 2009); State Rec., Vol. 2 of 5.

[7] State Rec., Vol. 2 of 5.

[8] State Rec., Vol. 3 of 5, transcript of December 21, 2011.

[9] State Rec., Vol. 3 of 5, minute entry dated September 21, 2016; State Rec., Vol. 3 of 5, Judgment dated September 29, 2016.

His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on December 28, 2016,[10] and the Louisiana Supreme Court on August 3, 2018.[11]

On October 11, 2018, petitioner filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[12] Although the respondent argues that the application is untimely,[13] the undersigned rejects that argument for the following reasons.

## I.  Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[14] For AEDPA purposes, a state criminal judgment consists of the conviction and the sentence, and a criminal judgment is therefore not considered "final" until *both* the conviction *and* the sentence are final. See Burton v. Stewart, 549 U.S. 147, 156-57 (2007); Scott v. Hubert, 635 F.3d 659, 665-67 (5th Cir. 2011).

With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

---

[10] State v. Arnold, No. 2016 KW 1366 (La. App. 1st Cir. Dec. 28, 2016); State Rec., Vol. 3 of 5.
[11] State ex rel. Arnold v. State, 249 So. 3d 821 (La. 2018); State Rec., Vol. 3 of 5.
[12] Rec. Docs. 1 and 5.
[13] Rec. Doc. 13.
[14] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Therefore, the Court finds that petitioner's state criminal judgment became final for AEDPA purposes on December 17, 2009, i.e. ninety days after the Louisiana Supreme Court denied his direct-review writ application challenging his sentence. As a result, his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

Regarding the statute of limitations provided in § 2244, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." Here, the respondent concedes that petitioner challenged his state criminal judgment on state post-conviction review but opines that there is uncertainty as to when that post-conviction application was actually "filed."

In a federal habeas corpus proceeding, Louisiana's "mailbox rule" is applied in determining the filing date of a Louisiana state court filing; therefore, such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006) (citing Houston v. Lack, 487 U.S. 266 (1988)). However, because state court records rarely reflect the date on which a prisoner placed a document in the prison mail system, courts often employ a rebuttable presumption that a document was "filed" in that manner on the date it was signed. See United States v. Minor, 582 F. App'x 315, 316 (5th Cir. 2014); Estes v. Boutté, Civ. Action No. 19-2289, 2020 WL 1990823, at *2 (E.D. La. Mar. 6, 2020), adopted, 2020 WL 1984331 (E.D. La. Apr. 27, 2020); Crochet v. Goodwin, Civ. Action No. 13-3106, 2014 WL 5093995, at *2 n.10 (E.D. La. Oct. 8, 2014); Thornton v. Terrell, Civ. Action No. 09-1631, 2009

WL 4855743, at *1 n.1 (E.D. La. Dec. 4, 2009). In the instant case, petitioner signed his state post-conviction application on June 15, 2010.

"Of course, if there is *other* evidence establishing the *actual* date a document was placed in the prison mailing system, the foregoing general presumption does not apply." Estes, 2020 WL 1990823, at *2; accord Pierre v. Cain, Civ. Action No. 15-5252, 2019 WL 3779675, at *4 (E.D. La. Aug. 12, 2019) ("Courts may only presume an inmate's signature date to be the date of presentation when there is no other proof of when the pleadings were presented for mailing."). In the response in this proceeding, the respondent argues that perhaps petitioner did not place his application in the prison mailing system until much later and therefore requests that the Court order him to submit proof that he in fact mailed the application on the date it was signed. However, that would be inappropriate, because the statute of limitations is an *affirmative defense* on which a habeas *respondent* bears the burden of proof. Ray v. Clements, 700 F.3d 993 (7th Cir. 2012). As the Seventh Circuit explained: "Generally, the party raising an affirmative defense bears the burden of proof. The same is true in the habeas context." Id. at 1006. The Seventh Circuit further reasoned that this general rule should apply with extra force when a Court is faced with the issue of when a *pro se* prisoner delivered an item to his custodian for mailing, because the prisoner's custodian oversees the mailing procedures and in the best position to furnish proof on that issue:

> We should not forget that it is the state, vis-à-vis the prison, that determines how prison mail is handled in the first place. The state could require its prisons to implement detailed intake and outgoing procedures for prisoner mail, including signatures on receipt, copies of envelopes addressed to the court, or other mechanisms aimed at closely tracking prisoner mail. We see no reason why a prison's failure to institute such procedures should serve to penalize *pro se* prison litigants. Instead, it reinforces our belief that "the prison [should bear] the burden of showing that the prisoner should not be entitled to the benefits of Houston's dispensation." See Thomas v. Gish, 64 F.3d 323, 325 (7th Cir. 1995). This is so because the prison could, if it wanted, adopt these or similar procedures. Its failure to do so leaves the *pro se* prisoner bearing the risk that his document will be mishandled, but without the means of proving his case. Since it has control over

4

> the prison mail policies, control over prisoner mail, and control over the prisoner himself, the state should bear the burden of proving that a pro se prisoner's federal habeas petition is untimely. See Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001) (per curiam) ("[A] prisoner's pro se § 2255 motion is deemed filed the date it is delivered to prison authorities for mailing" and "the burden is on prison authorities to prove the date a prisoner delivered his documents to be mailed. Absent evidence to the contrary in the form of prison logs or other records, we will assume [the petitioner's claim is true]."). To the extent the state feels it is tasked with "proving a negative," it can allay those concerns by implementing procedures to better track and document its prisoners' outgoing mail. See id.

Ray, 700 F.3d at 1011.

In federal habeas corpus proceedings, respondents in fact routinely furnish courts with prison mail logs to establish that a prisoner did not timely submit his documents for mailing to the courts. See, e.g., Medina v. Cockrell, No. 01-40049, 2002 WL 1396947, at *1 (5th Cir. June 6, 2002); Martin v. Director, TDCJ-CID, Civ. Action No. 4:15cv469 c/w 4:15cv470, 4:15cv471, and 4:15cv472, 2018 WL 3060529, at *3 (E.D. Tex. Apr. 4, 2018), adopted, 2018 WL 3046571 (E.D. Tex. June 19, 2018); Gillam v. Davis, No. 3:15-CV-2692, 2017 WL 3447866, at *10 (N.D. Tex. July 14, 2017), adopted, 2017 WL 3437220 (N.D. Tex. Aug. 10, 2017); Winfrey v. Stephens, Civ. Action No. H-15-1936, 2015 WL 7738076, at *3 (S.D. Tex. Nov. 30, 2015). The fault that such evidence was not submitted in this case therefore lies squarely on the respondent. Accordingly, because the respondent has provided no evidence to the contrary, this Court will employ the normal presumption that petitioner's state post-conviction application was filed on the date it was signed, i.e. June 15, 2010, which was one hundred seventy-nine (179) days after his limitations period commenced.

As a result, pursuant to 28 U.S.C. § 2244(d)(2), petitioner's federal limitations period was tolled as of that date. Further, his post-conviction application then remained "pending" for the purposes of § 2244(d)(2) – and the limitations period therefore remained tolled – for the *duration* of the post-conviction proceedings, so long as he continued to seek review at the higher levels of

the state court system in a timely manner. <u>Grillette v. Warden, Winn Correctional Center</u>, 372 F.3d 765, 769-71 (5th Cir. 2004). In this case, the respondent does not challenge the timeliness of petitioner's related collateral-review writ applications. Accordingly, the Court finds that the limitations period remained tolled from June 15, 2010, the date on which the original post-conviction application was filed, until August 3, 2018, the date on which the Louisiana Supreme Court denied relief.[15]

After that denial, petitioner still had one hundred eighty-six (186) days of his federal limitations period remaining. Because he filed his federal application on October 11, 2018,[16] a mere sixty-nine (69) days later, it was timely.

Because the respondent has failed to establish that the application was untimely and has raised no other procedural defenses, the Court will now address the merits of petitioner's claims.

## II. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002); <u>accord</u> <u>Langley v. Prince</u>, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), <u>cert. denied</u>, No. 19-6413, 2020 WL 1906607 (U.S. Apr. 20, 2020). The applicable standards of review are now as follows.

---

[15] A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief. <u>Lawrence v. Florida</u>, 549 U.S. 327, 332 (2007); <u>Ott v. Johnson</u>, 192 F.3d 510, 512-13 (5th Cir. 1999).

[16] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." <u>Roberts v. Cockrell</u>, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner initiated this federal habeas corpus proceeding by filing a petition he signed on October 11, 2018. Rec. Doc. 1. Absent any evidence to the contrary, the Court will again assume that the petition was placed in the mail on the date it was signed.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

<u>Woodall</u>, 572 U.S. at 426 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Renico v. Lett</u>, 559 U.S. 766, 779 (2010) (emphasis added).  The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  <u>Woodall</u>, 572 U.S. at 417.

### III.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On June 27, 2003, Darryl Price and another perpetrator, identified at trial by Price and other witnesses as the defendant, committed an armed robbery at the Bank One University Branch in Terrebonne Parish.  They took over $35,000 from the bank.
> According to the testimony of Price and Roger Parker, Jr., Price, Parker, William Smith, and Alicia, a friend of Parker, drove to Louisiana from California several days before the robbery.  In California, Price, Parker, and William Tribble had discussed robbing a bank in Louisiana.  A day or so after arriving in Louisiana, Price and Parker picked up Tribble and the defendant from the New Orleans Airport.  They rented two rooms at the Deauville Motel in Thibodaux and formulated a plan to rob the bank.  Present at this meeting were Price, Tribble, Parker, Milton Livas (Parker's cousin from Louisiana), and the defendant.  In preparation for the robbery, they bought a car, phones, and walkie-talkies.  The guns to be used were obtained from Tribble and Livas.
> On the day of the robbery, Price and the defendant parked in the bank parking lot.  Parker, Tribble, and Livas sat in the newly-bought car across the street from the bank.  Gladys Harris, a friend of Price, was waiting in a third car at an arranged location.  Price entered the bank and stood in line.  Ten to twenty seconds later, the defendant entered the bank, pulled out his gun, announced it was a holdup,

and ordered everyone to get down on the floor. Price jumped the counter, pulled out his gun, and told one of the female employees to open the safe. She opened the safe, but it contained only coins. At this point, another female employee approached the defendant and told him to take the money "in the teller." The defendant went to three different teller spots and had an employee put money from each spot into a pillowcase. When the defendant told Price that their time was up, Price and the defendant exited the bank and drove away in their car. Moments later, a red dye pack exploded in the pillowcase full of money. Price continued to drive. Several blocks later, however, he lost control of the car and crashed into a ditch. Price and the defendant ran in opposite directions. According to Price, the defendant had the money with him.

Brian Davis, an eyewitness to the accident, testified at trial that, prior to the car going into a ditch, he saw "red stuff" fly out of the passenger window. After the car crashed, Davis described the person who got out of the driver's seat as a "black guy." He described the person who got out of the passenger seat as a "Mexican guy." He further testified that the "black guy" was running with a white bag in his hand, and that the other man had nothing.

Moments later, Tribble picked up the defendant. Unable to find Price, they returned to the motel room. Price, who had run to an enclosed shed-like area of a nearby house, removed the outer layer of his clothing and exposed another layer of clothes underneath. After hiding for a while, Price emerged and was apprehended by six police officers. Price was arrested and <u>Mirandized</u>. He then gave a recorded statement to Detective Malcolm Wolfe. According to Price, his testimony given at trial was essentially the same as the statement he gave to Detective Wolfe. In his statement, Price told Detective Wolfe about all those involved in planning the armed robbery and about the rented motel rooms. Price also stated that he and the defendant went inside the bank with guns. Based on Price's statement, Detective Wolfe was able to apprehend some of those involved with the armed robbery, including the defendant. However, Parker, Tribble, and Harris drove back to California before they could be apprehended. Parker was arrested about thirty days later in California. Parker identified the defendant as a perpetrator of the armed robbery.

Three eyewitnesses to the robbery at the bank testified at trial. Tommy Picou, a customer, positively identified the defendant as one of the two perpetrators of the armed robbery. According to Picou, as he was walking out of the bank with his family, the defendant walked in, pointed a gun at Picou, and told him and his family to get back into the bank and get on the floor. As the defendant was walking in, [sic] Picou stated that, as the defendant was walking in, it looked as if the defendant was putting on a hat and covering his face with a bandanna. On cross-examination, Picou testified that, although he was asked by a police officer to try to identify any suspects shortly after the robbery, he could not.

Curt Domangue, the bank manager, testified that the person who was pointing a gun at Picou had a cap on and a bandanna covering his face. Domangue stated that the gunman had a light tan and described him as "almost Hispanic" or Indian. On cross-examination, Domangue stated that when he gave a recorded statement to the police, he did not mention that the perpetrator was Hispanic or

Indian. When asked if he could see the perpetrator's face, Domangue testified, "Not with the bandanna over his nose and mouth."

Julie Olin, the assistant manager at the bank, positively identified the defendant as one of the perpetrators of the armed robbery. She testified that she and the defendant were looking at each other when the defendant entered the bank. According to Olin, the defendant then pulled his sweatshirt up over his face and screamed, "Don't look at my face!" Olin described the defendant as "white complected-like real light."[17]

### IV. Petitioner's Claims [18]

#### A. Brady Violation/ Knowing Presentation of False Testimony at Trial

Petitioner argues that his rights were violated when the prosecutor (1) withheld evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, and (2) knowingly presented false testimony at trial. Both of those claims are premised on an underlying contention that the pretrial statements of Tommy Picou, Julie Olin, and Curt Domangue cast doubt on the veracity of their trial testimony. Specifically, petitioner contends that the pretrial statements indicate that it would have been impossible for an eyewitness to identify the robber because his face was covered throughout the robbery. Therefore, before analyzing the merits of these two claims, the Court will first compare the portions of the witnesses' testimony and pretrial statements which touch on that issue.

#### 1. Comparisons

#### a. Picou

At trial, Picou testified that, as he was leaving the bank on the day of the robbery, one of the robbers entered the bank and told him to get down on the ground. He testified that he and the robber were "pretty much standing face to face"[19] and that the robber was "putting a hat and almost

---

[17] <u>State v. Arnold</u>, 970 So. 2d 1067, 1069-71 (La. App. 1st Cir. 2007); State Rec., Vol. 2 of 5.
[18] For ease of analysis, petitioner's claims are addressed in this opinion in a different order than they were listed in his federal application.
[19] State Rec., Vol. 1 of 5, transcript of March 11, 2004, p. 105.

like a handkerchief or a bandanna over his face."[20]  Picou then identified petitioner in court as the robber.[21]  The trial transcript thereafter reflected the following exchange on cross-examination regarding whether Picou had previously identified the robber during the investigation:

> Q. [by defense counsel] Okay.  Were you ever asked to try to make an identification of any suspects?
>
> A. [by Picou] After – yes, after the bank robbery was over with.
>
> Q. Were you ever able to identify any suspects?
>
> A. No, sir.[22]

 Petitioner first argues that Picou's in-court identification was suspect since he had not previously identified petitioner as the robber during the investigation.  However, that argument is unpersuasive, because neither Picou's testimony nor his pretrial statement leads to the conclusion that he was ever asked to identify petitioner or any other specific suspect in a line-up or by other means during the investigation, much less that he was asked specifically to identify petitioner as the robber, but failed to do so.

Petitioner next argues that Picou's pretrial statement indicated that he was *never* able to see the robber's face, conflicting with his testimony that the robber was *in the act of covering has face as he entered* – a difference which then allowed Picou to purportedly identify petitioner as the robber at trial.  However, in his pretrial statement, Picou did *not* say that the robber's face was covered for the *duration of their encounter*; on the contrary, he stated:

> [The robber] had a hat that he *kept covering* his face with the hat or a scarf or something, he kept holding something in front of his face so you really couldn't see his face *that good*. …
>               …

---

[20] <u>Id.</u> at p. 106.
[21] <u>Id.</u> at p. 108.
[22] <u>Id.</u> at p. 110.

... [H]e kept his eyes and his nose and his mouth covered throughout *almost* the whole situation.[23]

That statement, fairly read, does *not* suggest that the robber's face was covered the *entire* time.

For these reasons, the Court finds that Picou's pretrial statement was not necessarily inconsistent with his trial testimony and did not otherwise render his testimony suspect.

### b. Olin

Olin testified at trial that she was working as an assistant manager at the bank on the day it was robbed.[24]  She further testified that she saw the robber as he was entering the bank, explaining:

> I was locking up for the day.  And while I was locking up, I was facing the lobby area; and I noticed him come in.  And I was looking – we were looking eye to eye at each other.  And all of a sudden I saw the gun come out.  And then since we were looking at each other, he pulled his sweat shirt up over his face to hide, and then he started screaming, "Don't look at us!  Don't look at my face!"[25]

She was approximately twelve feet from the robber at that point, and she looked at him for "[m]aybe half a minute."[26]  She likewise identified petitioner as the robber at trial, noting that when he first came in "his face wasn't covered up" and "he didn't have a hat on" and, therefore, she "could ID him exactly."[27]  Although vigorously challenged on that point on cross-examination, Olin was unwavering in her testimony that petitioner was not wearing a hat and his face was uncovered *when he first entered the bank*.[28]

That testimony is not inconsistent with her pretrial statement.  In that statement, Olin also indicated that the robber's face was initially uncovered.  Specifically, she said: "I saw one of the guys walk in, pull the gun out and *when he pulled the gun out he pulled his shirt up to cover the*

---

[23] State Rec., Vol. 2 of 5, Statement of Tommy Picou, pp. 2-3 (emphasis added).
[24] State Rec., Vol. 1 of 5, transcript of March 11, 2004, p. 119.
[25] <u>Id.</u> at p. 120.
[26] <u>Id.</u> at p. 121.
[27] <u>Id.</u> at p. 127.
[28] <u>Id.</u> at pp. 131-36.

*bottom part of his face ....*"[29]  The clear implication of that statement is that his face was *uncovered until* he drew his gun.  That is made further apparent by her later comments, in which she explained:

> [H]e would be heavy bearded but he was *clean shave*.  He actually reminds me of a customer we have … and so I saw the resemblance when he came in.
> ….
> *I saw him really good because it was before the gun came out.*[30]

That, too, implies that the bottom half of the robber's face was uncovered initially and that she got a good look at him.  Therefore, again, her trial testimony was consistent with her pretrial statement.

### c.  Domangue

Domangue testified that he was working at the bank on the day it was robbed.[31]  He testified that the robber was "wearing a cloth or a bandanna on his – covering his face."[32]  That testimony is consistent with his pretrial statement, in which he said he did not "notice [the robber's] face at all" because "possibly he had it covered with his shirt or I just noticed something black over his face and he might have been wearing a cap."[33]

Moreover, to the extent that petitioner is suggesting that Domangue's pretrial statement casts doubt on in-court identifications made by Picou and Olin,[34] as well as their testimony that the robber's face was initially uncovered, it does not.  Unlike Picou and Olin, Domangue did not see the robber *as he entered the bank*; Domangue first noticed the robber only *after* he yelled for people to get down.[35]

---

[29] State Rec., Vol. 2 of 5, Statement of Julie Olin, p. 1.
[30] Id. at p. 2 (emphasis added).
[31] State Rec., Vol. 1 of 5, transcript of March 11, 2004, pp. 141-42.
[32] Id. at p. 145.
[33] State Rec., Volume 2 of 5, Statement of Curt Domangue, p. 2.
[34] Domangue was not asked to – and did not – identify petitioner at trial as one of the robbers.
[35] See State Rec., Vol. 1 of 5, transcript of March 11, 2004, p. 143.

14

Petitioner also seems to suggest that Domangue was inconsistent regarding whether the robber's race was identifiable. At trial, Domangue testified: "I noticed the color of his skin. ... It was light – light tan. Almost Hispanic. Or Indian."[36] However, in his pretrial statement, he said that he could not tell whether the robber "was a white male or a black male."[37] However, that, too, is not necessarily inconsistent – in neither instance did Domangue say he could conclusively ascertain the robber's race from his appearance.[38] That is hardly surprising given that skin tones can vary dramatically within races. For example, obviously, not all African-Americans are dark-skinned; on the contrary, some African-Americans are virtually indistinguishable from Caucasians or light-skinned members of other races, such as Hispanics or Indians. Therefore, Domangue's statement that he was unable to tell whether the robber was "white" or "black" cannot necessarily be read to mean anything more than that – and it does not render trial testimony suspect.

### 2.  Specific Claims

Turning now to the merits of these first two claims, the undersigned recommends that they be denied for the following reasons.

### a.  Brady Violation

Petitioner argues that the prosecutor unlawfully withheld the pretrial statements of Picou, Olin, and Domangue. In the state post-conviction proceedings, the district court denied that claim, holding:

> As [to] the allegedly suppressed witness statements, Arnold failed to meet his burden of proof of prosecutorial misconduct under the standard of <u>Brady v. Maryland</u>, 83 S.Ct. 1194 (1963).[FN2]  Arnold contends that he could have used the statements to cross examine the state's witnesses, undermine their testimony, and further his misidentification defense. Arnold has not shown that the statements

---

[36] <u>Id.</u> at p. 145.
[37] State Rec., Volume 2 of 5, Statement of Curt Domangue, p. 2.
[38] When asked at trial where he got the idea that the robber might be Hispanic or Indian, Domangue explained: "Well, I just put two and two that a light skinned gentleman might be – I don't know what nationality his was, sir." State Rec., Vol. 1 of 5, transcript of March 11, 2004, p. 153.

are material. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding may have been different. There was also more than enough other evidence to prove he committed this crime.

> [FN2] Pursuant to <u>Brady</u> and its progeny, a prosecutor does not breach his duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial. <u>United States v. Agurs</u>, 96 S.Ct. 2393 (1976); <u>State v. Willie</u>, 410 So.2d 1019 (La. 1982).[39]

The Louisiana First Circuit Court of Appeal then denied his related writ application without assigning reasons.[40] The Louisiana Supreme Court thereafter likewise denied relief, stating simply: "Relator fails to show that the state withheld exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)."[41]

Because this claim was denied on the merits in state court, this Court's role is limited to deciding "whether the state court's <u>Brady</u> determination resulted in a decision that [was] contrary to, or involved an unreasonable application of, clearly established federal law." <u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006). For the following reasons, the undersigned finds it was not.

Because the state court correctly identified <u>Brady</u> as the clearly established federal law governing petitioner's claim, and because he has not pointed to (and the undersigned's research has not found) a United States Supreme Court case with materially indistinguishable facts reaching a contrary result, petitioner clearly has not established that relief is warranted under the "contrary to" prong of the AEDPA analysis. Accordingly, the only remaining question is whether the decision violated the "unreasonable application" prong. For the following reasons, the undersigned finds that it did not.

With respect to <u>Brady</u> claims, the United States Supreme Court has held:

---

[39] State Rec., Vol. 3 of 5, Judgment dated September 29, 2016, p. 2.
[40] <u>State v. Arnold</u>, No. 2016 KW 1366 (La. App. 1st Cir. Dec. 28, 2016); State Rec., Vol. 3 of 5.
[41] <u>State ex rel. Arnold v. State</u>, 249 So. 3d 821 (La. 2018); State Rec., Vol. 3 of 5.

> A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (internal citations and quotation marks

omitted).    Therefore, to prevail on a Brady claim, a petitioner "must show that (1) the state

withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material

to guilt or punishment."   DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002).

Here, petitioner's claim does not survive even the first prong of the Brady analysis, in that

he has not established that the pretrial statements of Picou, Olin, and Domangue were "withheld"

from the defense. At trial, the court found that the prosecutor provided defense counsel with "open

file" discovery;[42] further, at the post-conviction hearing, both the prosecutor and defense counsel

testified that "open file" discovery was in fact provided.[43]  That said, petitioner correctly notes that

the mere fact that "open file" discovery was provided does not *necessarily* doom his claim because

the statements may not have been included in the prosecutor's file.  Of course, the prosecutor

testified at the post-conviction hearing that the statements would have been in his file;[44] however,

in any event, that dispute is ultimately immaterial in this case.

*Even if* the Court assumes for the purposes of this opinion that the statements were not

included in the file, petitioner states in his federal application that they were provided to the

defense *on the evening before the trial began*.[45]  Moreover, the record in fact clearly shows that,

at the latest, defense counsel had the statements at trial, given that he acknowledged as much on

---

[42] State Rec., Vol. 1 of 5, transcript of March 11, 2004, p. 140.
[43] State Rec., Vol. 3 of 5, transcript of December 21, 2011, pp. 6-8 and 19-21.
[44] Id. at pp. 20 and 31-32.
[45] Rec. Doc. 5, pp. 7-8.  That was also petitioner's position at the post-conviction hearing. See State Rec., Vol. 3 of 5, transcript of December 21, 2011, p. 41.

the record[46] and  referenced them when cross-examining  witnesses.[47]  That alone suffices to foreclose petitioner's Brady claim, because evidence provided  to the defense *before or at trial* is not considered to have been "withheld"  in violation  of Brady.  See, e.g., Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994) ("Brady claims involve  the discovery, *after trial* of information which had been known to the prosecution but unknown to the defense.  Because we find that the [the evidence was] disclosed *at trial*, we hold that the prosecution  did not suppress any evidence." (emphasis added; citation and quotation  marks omitted)); United States v. McKinney,  758 F.2d 1036, 1049-50 (5th Cir. 1985) (holding  that the prosecution did not suppress evidence where Brady materials were disclosed at trial and reasoning that "[i]f the defendant received the material in time to put it to effective use at trial, his conviction  should  not be reversed simply  because it was not disclosed as early as it might have, and indeed,  should  have been"); Smith v. Travis, Civ. Action No. 08-4627, 2009 WL 1704335, at *10 (E.D. La. June 16, 2009) ("Where, as here, the evidence at issue came to light during  trial in sufficient  time for defense counsel to put it to effective use, it was not 'suppressed'  in violation  of Brady and its progeny."); Stogner v. Cain, Civ. Action No. 05-4317, 2008 WL 269078,  at *20  (E.D. La. Jan. 30, 2008) (same); Baker v. Cain, Civ. Action No. 05-3772, 2007 WL 1240203,  at *5 (E.D. La. Apr. 26, 2007) (same).[48]

---

[46] State Rec., Vol. 1 of 5, transcript of March 11, 2004, p. 139.

[47] See, e.g., id. at pp. 131 (referencing Olin's statement), 152-53 (referencing Picou's statement) and 154 (referencing Domangue's statement).  Although, *years later*, defense counsel testified at the post-conviction hearing that he had had *not* been provided with the statements, see State Rec., Vol. 3 of 5, transcript of December 21, 2011, pp. 12-14 and 17,  his memory was obviously faulty on that point, given the foregoing contrary admission and his use of the statements at trial.

[48] The Court notes that, at worst, the prosecutor's action *may* have been a discovery violation.  However, even if so, that is immaterial in the federal proceeding.  There is no general federal constitutional right to discovery in a criminal case, and, therefore, a claim that a prosecutor violated state discovery rules simply is not cognizable on federal habeas review.  Weatherford v. Bursey, 429 U.S. 545, 559 (1977); Lande v. Cooper, Civ. Action No. 11-3130, 2013 WL 5781691, at *16 (E.D. La. Oct. 25, 2013); Smith, 2009 WL 1704335, at * 10; Burns v. Lafler, 328 F. Supp. 2d 711, 723 (E.D. Mich. 2004).

Out of an abundance of caution, the Court additionally notes that petitioner's claim *also* fails on the *second* prong of the <u>Brady</u> analysis, because the pretrial statements simply were not "favorable to the accused." The statements in no way exculpated petitioner, and, contrary to his suggestion otherwise, they had no impeachment value because, as already explained in detail *supra*, the statements were not inconsistent with the trial testimony of Picou, Olin, or Domangue.

Finally, the Court notes that, although it is not entirely clear, perhaps petitioner is also suggesting that the defense may not have been provided with a copy of the "comprehensive police report and its attachments."[49] If so, that claim likewise falters on the first prong of the <u>Brady</u> analysis. Petitioner has provided no evidence whatsoever that any of the police reports were withheld from the defense; on the contrary, defense counsel testified at the post-conviction hearing that he believed he had received all of the reports.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision denying his <u>Brady</u> claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing, and, therefore, this Court should likewise deny relief.

### b. Knowing Presentation of False Testimony at Trial

Petitioner next claims that the prosecutor knowingly presented false testimony at trial, specifically the testimony of Picou, Olin, and Domangue. In the state post-conviction proceedings, the district court denied that claim, holding:

> As to the alleged perjured testimony, the Due Process clause of the federal and state Constitutions forbids the prosecution to knowingly use, or fail to correct, perjured testimony. <u>See</u> <u>Giglio v. U.S.</u>, 92 S.Ct. 763, 766 (1972); <u>Napue v. Illinois</u>, 79 S.Ct. 1173, 1178-79 (1959). To prove that the prosecution has denied him due process of law by relying on perjured testimony, Arnold must prove that (1) a witness for the state testified falsely; (2) the state knew the testimony was false; and (3) the testimony was material. Although Arnold argues that three witnesses

---

[49] Rec. Doc. 5, p. 12.

testified falsely, he presented no supporting evidence of perjury. He also presented no evidence that the State knew that any testimony was false.[50]

The Louisiana First Circuit Court of Appeal then denied his related writ application without assigning reasons.[51] The Louisiana Supreme Court thereafter likewise denied relief, stating simply that petitioner "fail[ed] to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[52]

A claim of prosecutorial misconduct, including the use of false testimony, presents a mixed question of law and fact. Eaglin v. Louisiana, No. 19-9659, 2020 WL 475770, at *28 (E.D. La. Jan. 7, 2020), adopted, 2020 WL 474923 (E.D. La. Jan. 29, 2020); Harvey v. Cain, Civ. Action No. 13-2994, 2013 WL 6490484, at *5 (E.D. La. Dec. 10, 2013). Therefore, to obtain federal relief, petitioner must show that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, the Court finds that he has not made that showing.

As the state district court correctly noted, due process may be violated if a prosecutor knowingly presents false testimony at trial or allows untrue testimony to go uncorrected. Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959). However, in order to prevail on such a claim, a petitioner "must show 1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." Canales v. Stephens, 765 F.3d 551, 573 (5th Cir. 2014) (quotation marks omitted); accord Devoe v. Davis, 717 F. App'x 419, 426 (5th Cir. 2018).

The Court can quickly dispose of this claim, because petitioner has presented no evidence whatsoever that Picou, Olin, or Domangue testified falsely, much less that the prosecutor knew

---

[50] State Rec., Vol. 3 of 5, Judgment dated September 29, 2016, p. 2.
[51] State v. Arnold, No. 2016 KW 1366 (La. App. 1st Cir. Dec. 28, 2016); State Rec., Vol. 3 of 5.
[52] State ex rel. Arnold v. State, 249 So. 3d 821 (La. 2018); State Rec., Vol. 3 of 5.

that they were committing perjury. As noted, this claim is instead premised on petitioner's underlying contention that their pretrial statements were inconsistent with their testimony or otherwise cast doubt on the veracity of their testimony. However, as already explained in detail *supra*, that is simply untrue.

Because petitioner has not demonstrated that the state court decision denying this claim was contrary to, or involved an unreasonable application of, clearly established federal law, this Court should likewise deny relief.

## B. Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel at trial. After an evidentiary hearing, the state district court denied that claim, holding: "Arnold failed to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 688 (1984). The Court adopts the arguments of the State in brief and at the hearing(s) herein as additional reasons for judgment."[53] The Louisiana First Circuit Court of Appeal then denied his related writ application without assigning reasons.[54] The Louisiana Supreme Court thereafter likewise denied relief, stating simply: "[R]elator … fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[55]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

---

[53] State Rec., Vol. 3 of 5, Judgment dated September 29, 2016, p. 2.
[54] State v. Arnold, No. 2016 KW 1366 (La. App. 1st Cir. Dec. 28, 2016); State Rec., Vol. 3 of 5.
[55] State ex rel. Arnold v. State, 249 So.3d 821 (La. 2018); State Rec., Vol. 3 of 5.

2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and*

> § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. at 105 (emphasis added; citations omitted). Therefore, on habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claim.

As the state court correctly held, the clearly established federal law with respect to such claims was set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a petitioner has the burden of proving both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. Id. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). Counsel's performance was deficient if it fell "below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must consider the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel fell

within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the Strickland test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In deciding whether prejudice occurred, courts review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

In the instant case, petitioner claims that his trial counsel was ineffective in several respects. For the following reasons, the Court finds otherwise.

Petitioner first argues:

> [D]efense counsel failed to properly prepare for trial by investigating unsubstantiated claims and potential witnesses, and presenting an adversarial defense. Counsel failed to notify the court of continuous problems with obtaining discovery material from the state, which resulted in the state's suppression of material evidence at a critical juncture. …
>
>        ….
>        In addition, defense counsel failed to obtain and/or review surveillance video of the robbery. Had counsel reviewed the surveillance video, he would be able to question witnesses about the impossibility of their vantage point. Counsel would have also been able to discredit the state's segmented use of the video, which offered plausibility to perjured witness testimony. Most of all, surveillance video would have proven as indicated in initial pretrial statements that the perpetrator's face was covered throughout the entire [sic] and that the accused was not the culprit.[56]

The foregoing argument touches on several different issues. The Court will address each of those sub-issues in turn.

As to the allegation that counsel "failed to properly prepare for trial by investigating unsubstantiated claims and potential witnesses," that aspect of petitioner's claim is purely

---

[56] Rec. Doc. 5, pp. 6-7.

conclusory, failing even to identify which claims were purportedly "unsubstantiated" or which "potential witnesses" allegedly went uninvestigated. That is fatal, because "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000); accord United States v. Holmes, 406 F.3d 337, 361 (5th Cir. 2005) ("To succeed on [an] ineffective assistance claim, [a petitioner] bears the burden of demonstrating that counsel's performance was deficient and that the deficient performance prejudiced his defense. [A petitioner] cannot escape this burden merely by stating his conclusion.").

As to the allegation that counsel failed to present "an adversarial defense," that claim is likewise conclusory. Moreover, if petitioner is alleging that defense counsel failed to vigorously defend him or hold the prosecution to its burden of proof, that is simply untrue, as the transcript shows. On the other hand, if petitioner is perhaps alleging that counsel decided to forego a particular defense, he has failed to identify that purported defense and show that there was in fact a legal and factual basis for it (whatever it may have been). However, simply because counsel was unable to fashion a nonexistent defense out of whole cloth does not mean that he performed deficiently or that prejudice resulted. See, e.g., United States v. Cronic, 466 U.S. 648, 656 n.19 (1984) ("[T]he Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade."); Krist v. Foltz, 804 F.2d 944, 946 (6th Cir. 1986) ("An attorney is not required to present a baseless defense or to create one that does not exist."); Robinson v. Cooper, Civ. Action No. 12-1327, 2013 WL 2154011, at *10 (E.D. La. May 21, 2013); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *9 (E.D. La. Mar. 20, 2008).

As to the allegation that counsel was ineffective for failing to notify the trial court of problems he encountered in conducting discovery, that allegation is meritless. At the post-conviction evidentiary hearing, defense counsel indicated that, although there had been delays, his discovery issues were resolved prior to trial.[57] By the time of trial, defense counsel had only one complaint, namely that he was not given sufficient notice that Picou and Olin would identify petitioner as the robber at trial. However, not only did counsel in fact voice that complaint at trial, he even moved for a mistrial on that basis.[58] Lastly, to the extent that petitioner is alleging that counsel's failure in this respect resulted in the prosecutor's suppression of the pretrial witness statements, that is simply untrue – as previously explained *supra*, those statements were *not* in fact suppressed.

As to the allegation that counsel failed "to obtain and/or review surveillance video of the robbery," it must be noted that no such video existed. Although the bank had security cameras, those cameras merely recorded a series of still photographs, not continuous video.[59]

Moreover, if petitioner is perhaps attempting to allege that counsel did not review all available still photographs, he must surmount two hurdles. First, when a petitioner is claiming inadequate investigation, he must present "actual evidence as to what investigative steps counsel took or failed to take. Without such evidence, he cannot show that counsel performed deficiently." Eaglin v. Louisiana, Civ. Action No. 19-9659, 2020 WL 475770, at *24 (E.D. La. Jan. 7, 2020), adopted, 2020 WL 474923 (E.D. La. Jan. 29, 2020). Here, petitioner has presented no evidence showing that counsel failed to review all available photographs. Second, even when a petitioner

---

[57] State Rec., Vol. 3 of 5, transcript of December 21, 2011, pp. 9-10.

[58] State Rec., Vol. 1 of 5, transcript of March 11, 2004, pp. 137-40.

[59] When Domangue was asked at trial whether the bank's surveillance tape was "like a regular video … [with] just one long continuance action," he responded: "No, it – what the surveillance tape does is we have a number of cameras throughout the bank; and it will do shots from each camera. Once those buttons are pressed to activate something going on inside the bank, it will start doing shots of, you know, at a quicker pace, of those same cameras." State Rec., Vol. 1 of 5, transcript of March 11, 2004, p. 149.

makes that preliminary showing, he must then additionally "prove that prejudice resulted from the inadequate investigation. To make that showing, he must point to evidence in the record demonstrating that further investigation would in fact have revealed additional information beneficial to the defense." Id. at *25. Petitioner's claim likewise fails on that basis – because he has not produced any photographs or presented any other evidence establishing that the still photographs would have, in fact, revealed anything of benefit to the defense.

Therefore, all aspects of petitioner's first argument are meritless.

Petitioner next argues:

> Petitioner asserts that defense counsel's failure to challenge the state's withholding of material evidence or to notify the court of these difficulties rendered him ineffective. In addition, defense counsel was ineffective in his failure to request a continuance, or to notify the court of the state's delivery of mass of discovery material only the evening prior to the trial.
> ….
> In the case *sub judice*, the state provided defense counsel with a bulk of discovery materials (including some pretrial witnesses statements of the state's witnesses) the evening prior to trial. The statements were made by witnesses whom the state intended to use at trial against the accused. Being aggrieved the action; defense counsel informed Petitioner that he would notify the court and seek a continuance. That being said, at the beginning of trial, defense counsel informed Petitioner that his request for continuance was denied in chambers by the trial judge. Nonetheless, at no time during the trial or on the record did counsel request a continuance or notify the court of the strenuous delays in receiving discovery material. There is no reasonable excuse for counsel to assert a trial strategy by not moving for continuance on the record. Had such a request been made on the record, defense counsel could have sought review of the Court of Appeal of the trial judge's abuse of discretion, in light of the actions of the state. In addition, defense counsel failed to preserve this matter for review on direct appeal.[60]

Obviously, this argument simply slightly repackages the previously discussed purported discovery problems by adding a contention that defense counsel should have used them as a basis for moving for a continuance on the record, thereby preserving that issue for appellate review. That argument is unpersuasive.

---

[60] Rec. Doc. 5, pp. 7-8.

A decision on whether to seek a continuance is a strategic choice generally accorded great deference. See, e.g., McVean v. United States, 88 F. App'x 847, 849 (6th Cir. 2004); Moore v. Casperson, 345 F.3d 474, 490 (7th Cir.2003); Brooks v. Cain, Civ. Action No. 06-1869, 2009 WL 3088323, at *13 (E.D. La. Sept. 21, 2009). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. Such second-guessing is particularly inappropriate in the instant case for the following reasons.

As an initial matter, counsel is not ineffective for failing to request a continuance unless it is reasonably probable that the trial court would have granted that request. See United States v. Flores-Ochoa, 139 F.3d 1022, 1024-25 (5th Cir. 1998). Here, petitioner alleges that counsel had already requested a continuance off the record and that request had been denied; therefore, there is simply no reason to believe that the request would have been granted if only counsel had reurged it on the record.

Second, although counsel failed to preserve the issue for appellate review, that is of little consequence. As the Louisiana Supreme Court has explained:

> This Court has consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. La.C.Cr.P. art. 712; State v. Turner, 2008-0289 p. 1 (La. 2/8/08), 974 So.2d 12; State v. Blank, 2004-0204 p. 9 (La. 4/11/07), 955 So.2d 90, 140, cert. denied, —— U.S. ——, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007). Blank additionally noted that this court "generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice." Id.

State v. Reeves, 11 So. 3d 1031, 1078-79 (La. 2009).

Here, there is no reasonable probability that an appellate court would have reversed petitioner's conviction based on the denial of a continuance. As already explained, defense counsel was in possession of the witnesses' pretrial statements prior to trial and, in any event, nothing therein was inconsistent with or supplied a basis for challenging their identifications of petitioner at trial. Accordingly, a continuance would not have benefited the defense or altered the defense strategy, and petitioner has therefore established no prejudice resulting from the denial of one.

Lastly, petitioner agues:

> In the instant case, defense counsel failed to object to or otherwise contest the admissibility of items seized from a motel storage six days after the effectuation of a lawful warrant on a motel room occupied by the accused and some acquaintances. During the course of the criminal investigation into the incident, police detectives obtained a search warrant for two rooms (#203 and #204) at the Deauville Motel. Thereafter, police officers executed the warrant and search both rooms to no avail. Apparently, the search of the rooms failed to net any incriminating evidence against the accused. As such, acting without a warrant, law enforcement officials returned to the motel six days later, and searched the motel's storage shed; where they claim to have found material evidence (clothing stained with dye).
> … The search of the storage unit without a warrant was illegal and in violation of LSA-Const. Art. 1, Section 5, which provides that any person adversely affected by search or seizure conducted in violation of this section shall have standing to raise its illegality in the appropriate court.[61]

This argument fails in two respects.

First, petitioner has not established that the evidence was in fact unlawfully obtained. He is correct in noting that the evidence was not discovered in either of the two motel rooms listed in the search warrant;[62] it was established at trial that the evidence was "taken from some kind of storage room where after all the suspects were removed from the room the management had collected all those items and stuck it in this storage room in case they would ever come back for

---

[61] Rec. Doc. 5, p. 9.
[62] State Rec., Vol. 1 of 5, search warrant.

it."[63]  However, that is of no consequence, because, obviously,  a search can be valid even without a warrant.  For example, Louisiana law recognizes that a search is lawful (and the evidence obtained in that search is admissible) if it was conducted with *consent*.  <u>See, e.g.</u>, <u>State v. Thompson</u>, 93 So. 3d 553, 574 (La. 2012) ("It is well settled that a search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions.  Consent is one of the specifically established exceptions to the requirements of both a warrant and probable cause to a search." (citation and quotation marks omitted)).  Here, it is reasonable to assume that the motel management alerted the police to the evidence in the storage shed and consented to the search of that area; petitioner certainly has not established otherwise.

Out of an abundance of caution, the undersigned notes that it is true that the motel's management could not have consented to a warrantless search of ***petitioner's*** room during his term of occupancy.  <u>See</u> <u>Stoner v. California</u>, 376 U.S. 483, 490 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.  That protection would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel." (citations omitted)); <u>State v. Stewart</u>, 656 So.2d 677, 679 (La. App. 2d Cir. 1995) ("Although not absolute, [the] protections against nonconsensual entry and unreasonable searches and seizures afforded by both the Fourth Amendment to the Federal Constitution and Article 1, Section 5 of the Louisiana Constitution extend to a guest in a motel room.  Nevertheless, it is well settled that a guest at such an establishment has no reasonable expectation of privacy in a room after the rental period has expired." (citations omitted)).  The evidence at issue here, however, was unclaimed

---

[63] State Rec., Vol. 2 of 5, transcript of March 12, 2004, p. 31.

property removed by the motel management to the motel's storage room after petitioner's stay at the motel concluded. As a result, petitioner has not shown that the search was unlawful, because he had no control over – or expectation of privacy in – the motel's storage area.

Second, even if the admissibility of that evidence had been challenged and the evidence had in fact been excluded from trial, there is no reasonable probability that the result of this proceeding would have been different. On the contrary, petitioner was conclusively identified at trial as one the robbers by no less than two eyewitnesses and a co-defendant. That testimony alone sufficed to support the verdict, and it was certainly more damaging to petitioner than the physical evidence recovered from the motel's storage area.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief filed by Christopher Sheldon Arnold be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  28 U.S.C. § 636(b)(1);  Douglass v. United Services Auto. Ass'n,

79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[64]

New Orleans, Louisiana, this  30th  day of June, 2020.


JANIS VAN MEERVELD
UNITED STATES MAGISTRATE JUDGE

---

[64] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.